UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

Erin Daly

                    Plaintiff,                    **COMPLAINT**

           v.                              **JURY TRIAL**
                                                **REQUESTED**
Citigroup Inc.
Citigroup Global Markets, Inc., and
Citibank, N.A.

                    Defendant.

_____X

      Plaintiff, Erin Daly ("Erin" or "Plaintiff"), by her attorney, Michelle Daly, Esq.,

as and for her complaint against Citigroup Inc., Citigroup Global Markets, Inc., and

Citibank, N.A. ("Citi" or "Defendant"), alleges as follows:

<u>NATURE OF THE ACTION</u>

1. Plaintiff brings this action against Citi to redress unlawful discrimination and

    subsequent retaliation in the terms, conditions and privileges of her employment

    in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2002e

    ("Title VII"), New York State Human Rights Law, Executive Law §290 <u>et seq</u>.

    ("*NYSHRL"*) and the Administrative Code of the City of New York § 8-101 <u>et</u>

    <u>seq</u>. ("NYCHRL") based upon her gender, female.

2. Plaintiff suffered discrimination and retaliation in all major aspects of her

    employment including preventing job referrals, job assignments and promotions,

    then suffered unwarranted poor performance reviews, disparate treatment with

    regard to discipline and discharge, and was excluded from all employment

    references as a result of her gender, female.

3. Plaintiff suffered retaliation via unwarranted poor performance reviews after engaging in protected conduct, then given additional job duties, and finally suffered wrongful termination as a result of her gender, and her protected whistleblowing activities.

4. Specifically, Erin had her business functionality deliberately taken from her to exclude her from business opportunities and professional advancement.

5. She then suffered distinct gender disparities in business opportunities and diminished client contact.

6. This exclusion from her business functionality resulted in loss of opportunity and is a result of Citi's "boys' club" policies and practices which underlie a culture of gender discrimination.

7. The gender disparity is most clearly evidenced by the deliberate exclusion of females on the desk from allocating stock or even being able to view the full "book" which is the itemized and summarized description of the involved parties, their respective interest, and finally allocation on each deal.

8. This systematic exclusion of females from any real functionality resulted and continues to result in diminished client contact, opportunity for advancement, and pigeonholing into service, administrative, and secretarial roles for females.

9. As a result of this systematic exclusion, Citi fails to pay male and female employees equal wages in violation of the Federal Equal Pay Act, 29 U.S.C. §206(d) (the "EPA"), and the New York State Labor Law §194 (the "Labor Law").

10. As more specifically set forth herein, Citi's deliberate discriminatory acts towards Erin because she is a woman directly resulted in diminished client contact and interaction, marginalization, and reduced her commercial opportunities down to zero.

11. Citi's deliberate exclusion of Erin from her normal business function, and her exclusion from meetings with upper management discredited her to her peers and her clients and ultimately destroyed her professional career.

12. Erin was retaliated against for her complaints concerning Citi management's discriminatory acts towards her for being female.

13. Plaintiff was retaliated against for her complaints concerning Citi management's unlawful violations of insider trading laws.

<u>PARTIES</u>

14. Plaintiff, Erin Daly is a woman who lives at 150 West End Avenue, New York, NY 10023. She is a citizen of the United States.

15. Plaintiff was an employee of Defendant, Citi from 2007 through 2014 and has been unlawfully terminated.

16. Plaintiff suffers from systemic and ongoing discrimination and retaliation from Defendant.

17. Upon information and belief, Defendant Citi is a Delaware corporation doing business within New York County in the State of New York and maintains corporate headquarters within the City and County of New York at 388-390 Greenwich Street, New York, NY 10013.

18. Upon information and belief, Defendant maintains control, oversight, and direction over the operation of its facilities, including employment practices.

19. During all relevant times, Defendant, Citi was Plaintiff's employer within the meaning of all applicable statutes.

<u>JURISDICTION AND VENUE</u>

20. This Court has federal jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343 and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2002e ("Title VII") and 15 U.S.C. § 78u- 6(h)(1)(B)(i), (the Whistleblower protections under Dodd Frank).

21. This court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the state claims are so related to the federal claims that they form part of the same case and controversy under Article III of the U.S. Constitution.

22. This court has jurisdiction over all actions as they constitute a continuing violation of Plaintiff's rights under New York and Federal laws.[1]

23. Under the continuing violation doctrine, a "lawsuit that is timely as to any incident of retaliation in furtherance of an ongoing policy is timely as to all claims of acts of retaliation under that policy even if they would be untimely standing alone." *Crosland v. City of New York,* 140 F. Supp. 2d 300, 307 (S.D.N.Y. 2001)(citing *Cornwall v. Robinson,* 23 F.3d 694, 703-04 (2d Cir. 1994)).  The

---

[1] The Court in *Cornwall v. Robinson* held that "[w]hile discrete incidents of discrimination that are not related to discriminatory policies or mechanisms may not amount to a continuing violation, *see e.g.*, *Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2d Cir. 1993), *cert. denied,* 114 S. Ct. 1612, 128 L. Ed. 2d 339 [**28] (1994), a continuing violation may be found where there is proof of specific ongoing discriminatory polices [sic] or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice. 23 F.3d 694, 696 (2d Cir. N.Y. 1994).

doctrine requires three factors: 1) whether the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation; 2) frequency: whether the alleged acts are recurring; and of most importance 3) the degree of permanence. *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983).

24. For a Title VII claim to be filed in federal court, the claimant must have filed a timely complaint with the EEOC and obtained a right-to-sue letter.  *Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994).  Normally, a charge of discrimination with be filed with the Equal Opportunity Commission ("EEOC") within 180 days of the unlawful employment action, or within 300 day so the discriminatory action.  42 U.S.C. § 200e-5(3); *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 2070, 153 L.Ed.2d 106 (2002).  However, there is an exception for a continuing violation, which provides that where a plaintiff "files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination," the statute of limitations allows "all claims of discriminatory acts committed under that policy."  *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

25. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Southern District of New York.

Continuous Violation

26. Citi engaged in a continuing violation of Title VII and Defendant's discriminatory acts were committed in furtherance of a policy of discrimination.[2]

27. Citi employees, in an ongoing, egregious, continuous violation of her rights, acted in concert to ensure that not only would she never work for Citi again, but that she would never work in finance again.

28. The activity associated with a U5 form is detailed on the official Financial Industry Regulatory Authority, Inc. (hereinafter, "FINRA") website:  "There are currently six different Uniform Registration Forms that are used to file information with Web CRD.  The Form U4 (Uniform Application for Securities Industry Registration or Transfer) and the Form U5 (Uniform Termination Notice for Securities Industry Registration) are used by broker-dealers to register, and terminate the registrations of, associated persons with self-regulatory organizations (SROs), and jurisdictions."[3]

29. The U-5 is not merely written up once and then forgotten, but a dynamic system used by all parties in finance, and gives interested parties the power to ensure oversight, jurisdiction, and control over individuals such as Plaintiff.

30. FINRA requires all interested parties to review, revise, and maintain all U-5s on an ongoing basis.

31. In retaliation against Erin's protected actions, Defendant and Defendant's managers continues to violate Plaintiff's rights, in using the U-5 as a tool to

---

[2] There is a continuing violation exception to the time limitation, which provides that if a plaintiff "files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination," the statute of limitations is extended "for all claims discriminatory acts committed under that policy" *Lightfoot v. Union Carbide Corp.*, 110 F. 3d 898, 907 (2d Cir. 1997).  *Also see Moore v. Publicis Groupe SA*, 868 F.Supp.2d 137 (2012).

[3] On the official FINRA website:  https://www.finra.org/industry/web-crd/current-uniform-registration-forms-electronic-filing-web-crd

ensure that Erin will not only never work for Citi again, but never work in finance again.

32. On Plaintiff's and on all U-5 Forms, FINRA demands:  "NOTICE TO THE INDIVIDUAL WHO IS THE SUJBECT OF THIS FILING:  Note:  Even if you are no longer registered, you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated and may have to provide information about your activities while associated with this *firm*."[4]

33. FINRA requires that individuals update the U-5 form for two years following their termination date or last Form U5 amendment.

34. Because FINRA requires that the U-5 is always accurate and up-to-date, any assertions made on the U-5 must be subject to the same constant scrutiny and ongoing jurisdiction.

35. The dynamic nature of the U-5 gives has ongoing import in finance.

36. With knowledge of the power and import of the U-5 Form in finance, after retaliating against Plaintiff's whistleblowing, and in retaliation against her requesting equal rights in the workforce, they made false, misleading, malicious and defamatory statements on her U-5 Form to ensure that she would never work in finance again.

37. The Citi employees responsible for Plaintiff's termination made false and defamatory statements on her U5 form and were the same employees who discriminated against Plaintiff and the same employees who were guilty of violating securities laws.

---

[4] On the official FINRA website:  https://www.finra.org/sites/default/files/AppSupportDoc/p015113.pdf

38. The language on Plaintiff's U-5 form is wholly false, malicious, and defamatory, stating that the Explanation for her Termination was: "CONCERNS THAT INCLUDED TARDINESS AND INSUBORDINATION IN CONNECTION WITH WORKING HOURS; CONCERNS ABOUT A SEPARATE INCIDENT IN WHICH THE REPRESENTATIVE FORWARDED CONFIDENTIAL INFORMATION ABOUT A PLANNED OFFERING TO A CO-WORKER, WITHOUT PROVIDING NOTICE AND RECEIVING APPROPRIATE APPROVALS WITHIN THE FIRM, EVEN THOUGH SUCH NOTICE AND PRE-APPROVAL WERE REQURIED BY FIRM POLICY; AND CONCERNS ABOUT REPRESENTATIVE'S RESPONSES TO CERTAIN FIRM QUESTIONS."

39. The language above is completely false and a pretext for the reasons she was actually fired, to wit: in retaliation for demanding equal treatment under the law and in retaliation for Plaintiff's whistleblowing for Defendant's violation of SEC rules.

40. WORKING HOURS:  Plaintiff constantly and continually worked over twelve hour days, which incidentally were longer hours than anyone else on the Desk, as evidenced in the entry/exit times for her personal key as well as conference calls and email timestamps throughout her career and employment with Defendant.

41. CONCERNS ABOUT A SEPARATE INCIDENT:  The incident to which the Form U-5 refers is the direct consequence in time and substance of Plaintiff blowing the proverbial whistle to human resources, her internal legal team and direct manager about her manager, James Messina's violations of Insider Trading

Information.  James Messina repeatedly demanded over-the-wall information about transactions, to which Plaintiff was privy, as further detailed below. Plaintiff was stonewalled by in-house attorneys, human resources, and finally terminated for acting specifically as ordered by a senior Defendant manager and Head of the Special Equity Transactions Group, Bob Leonard.

42. RESPONSES TO CERTAIN QUESTIONS:  This statement, written with spectacular vagary, was in reference to Defendant's questions concerning her concerns with her manager's violations of Dodd Frank and Sarbanes Oxley. Plaintiff expressed her concerns, was questioned about them, and was ultimately terminated for her protected and lawful activities.

43. Plaintiff's responses to "certain questions" surrounding those violations by her managers were what "concerned" Defendant.

44. Plaintiff, as clearly stated by Defendant in Plaintiff's U-5, was fired in retaliation to her "responses to certain firm questions" regarding Defendant's illegal activities.

<u>ADMINISTRATIVE PROCEDURES</u>

45. On November 28, 2016, Plaintiff filed a charge of discrimination with the Equal Opportunity Commission ("EEOC").  Upon receiving the Notice of the Right to Sue, Plaintiff will amend this complaint to add federal discrimination claims.

46. A copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code, following commencement of this action.

47. On November 28, 2016, Plaintiff filed a complaint with the Department of Labor ("DOL") alleging whistleblower retaliation in violation of Sarbanes Oxley.  Upon receiving notice of the Right to Sue from the Department of Labor, Plaintiff will amend this complaint to add retaliation claims under Sarbanes-Oxley, to the extent required to do so.

48. Any and all other prerequisites have been met.

<u>BACKGROUND</u>

49. Erin graduated with a Bachelor of Arts degree in Mathematics from University of Rhode Island in 2005.

50. In October of 2006, Erin began at J.P. Morgan Chase as a financial advisor.  She advised clients on investing in certain wrapped products (like mutual funds and proprietary products) and insurance products.  She was vested with the power to trade specific stock for clients.

51. In November, 2007, Erin was recruited by Drue Anderson and was hired dually by Citibank and Smith Barney brokerage house.

52. Erin moved within Citi into its brokerage department with her team and became the employee of Citi Personal Wealth Management brokerage house that remained within Citi.  Erin became more respected within the financial community and garnered the trust of more and more clients.  She would recommend equity, fixed income, mutual funds, and other wrapped products and insurance products for the benefit of her clients and would make allocations (non-discretionary, and as per the specific requests of her clients).

53. At Citi Personal Wealth Management, she realized 50% growth in assets under management and 55% expansion in revenue for her independently managed book.

54. In 2008, she was recognized top team associate in 2008 for surpassing imposed revenue and new account targets.

55. In 2010, Erin rose again within Citigroup to Citi Private Bank and promoted again within the private bank to Assistant Vice President.

56. There, Erin provided institutional-level investment capabilities to deliver strategic advice on asset allocation and market views, consistently providing investment ideas, and comprehensively evaluated clients' portfolios for strategy and risk assessment.

57. From 2010 at the Private Bank, she cultivated and grew strong relationships with clients based on integrity, excellent customer service and knowledge of their financial needs and goals.

58. She served as a key point of contact for all parties, and coordinated and executed billions of dollars in sensitive transactions that required trading/lending and hedging both publicly held and privately held companies

59. In 2012, she received the CEO Award for Excellence, cementing her financial acumen and the future of her career in the financial world.

60. Over her tenure, she was pivotal in increasing generated revenue to $26.4 million in 2014.

61. Significantly, Erin was responsible for designing, implementing, and managing the sensitive 10b5-1 trading programs.

GENDER DISCRIMINATION AND RETALIATION

## LOSS OF AUTHORITY AND RESPECT:  LOSS OF STOCK ALLOCATION AND BUSINESS FUNCTIONALITY

62. Initially, the privilege to view the "book" and the corresponding power to allocate stock was vested within Citi Equity Capital Markets (not part of the bank); here stock allocation was based on mathematical metrics rooted in items such as revenue to ensure fairness and good business dealings.

63. When Citibank's brokerage arm changed their clearing firms, the metric became less and less accurate.

64. To resolve this, the power to allocate stock was given over to the Private Bank, where Erin sat.

65. Correspondingly, those on the desk, including Erin had their identification changed to permit them to make stock allocation.

66. Erin became responsible for maintaining manual records of the revenue, which was then used to allocate stock fairly.

67. For the next year, allocations were made in accordance with the data kept by Erin, which reflected agreed upon metrics (so as not to favor one client to the detriment of another).

68. In 2009, Citi Private Bank (the "Desk") was given the power to distribute subjective stock.

69. This was a significant power for every individual vested with it.

70. Because of the discretion afforded the Desk in distributing stock of certain "hot" IPOs, individuals who had this power were seen as extremely valuable by clients and by other employees.

71. On June 29, 2012, Erin lost her access to make allocations.  Her entire ID was deleted.  However, what should have been a quick easy fix was *deliberately sabotaged*.

72. Defendant deliberately prevented Plaintiff from being returned her business functionality because she is female.

73. From that day on, Erin asked Defendant manager, and Plaintiff's superior, James Messina *EVERY SINGLE DAY* when she would be given back her ability to allocate stock, to no avail.

74. Plaintiff approached Victor Pagano, the Regional Supervisory Principal (and compliance person immediately governing James Messina's Desk) at least *every week* when her authority would be returned to her, to no avail.

75. Plaintiff regularly approached in person, on the phone, and via email her managers, requesting that her authority be returned to her.

76. Plaintiff's concerns were ignored, shrugged off or given excuses, the most ridiculous being that it was an "issue with compliance."  The only possible compliance issue might be if Plaintiff retained her business function, compliance might require that she be granted equal pay.  However, this too is illegal, and a weak and insufficient pretext to prevent her from retaining equal footing as the men.

77. Finally, Erin on January 18, 2013 sent out an email to Defendant's employees and managers, Victor Pagano, Asma Marinaccio, Lyndon Keyes and James Messina to redress the issue in writing:  "Please advise to where this is with compliance.  I am not sure why I am the only one on the equity desk who does not have this.

(Well, more specifically, why this was taken away).  **Is this because I am female?**  I hope not.  Hard to argue from any reasonable place.  Please advise" (emphasis added).

78. Instead of returning to Plaintiff her business function, she was threatened and reprimanded by Human Resources.  She was told, "***you can't say things like that*** because we take those things very seriously."

79. Her desperate attempts to be respected and returned her authority went unheeded.

80. From her conversation with human resources, Erin was made to understand if she did not apologize for requesting equal treatment, it would cost Plaintiff her job.

81. Erin was ***forced to publicly apologize for even asking for equal treatment***.

82. In an email sent on January 25, 2013, to Victor Pagano, Asma Marinaccio, Lyndon Keys and James Messina, Erin apologized:  "I apologize for the misinterpretation of my previous e-mail and the direct and indirect consequences for everyone.  The point I was trying to make, is that because the functionality is being used on my desk, I should have the entitlement.  If a decision is that my role within SMS is going to be handled away from our desk, due to a policy change, I understand that all of our entitlements may change.  Until then, I should have the same functionality as my team."

83. The message of the real corporate policy came in loud and clear from her bosses and human resources: "We're not allowed to discriminate against women so shut up or we'll all get in trouble."

84. Defendant failed to investigate the employee's complaint of discrimination and even coerced her into apologize for making such complaints.  Plaintiff thus seeks punitive damages.

85. Erin was still not returned her power to allocate stock.  She remained a secretary.

86. Erin was ignored or pushed away and in the absence of such ability, it was clear that she had no authority to clients calling in, and reduced her to secretary for the desk.

87. It became easier for the men to ignore her requests, as they became more comfortable with denigrating her from equal to secretary.

88. Erin stopped being included in certain meetings with Steve Bodurtha, Citi Private Bank, Investments Head of North America, superior to James Messina's boss.

89. Erin stopped being included in meetings with Nick Parcharidis, a professional exclusion that effectively and actually demoted her from maintaining her credibility, and stymied any efforts for her professional advancement.

90. Both Frank Cavallo and James Messina repeatedly told clients and other employees of Citi that they were the people in charge.

91. Clients, analysts, assistants, everyone heard the message.  ***The boys were in charge.  The men were doing business.***  Erin was just a glorified secretary.

92. When there were "hot deals," those for which the demand greatly exceeded the supply, Steve Bodurtha would come down to the desk and demand a certain amount of the extremely valuable stock for his favored clients.

93. These were not those that were favored by Citi, or according to the agreed upon metric, but his personal favorites.

94. These would advance him professionally and enhance his appearance to his managers and other superiors.

95. In September 19, 2014, Steve Bodurtha came down weeks before the Alibaba IPO, the largest IPO in history, and indicated he and James Messina were going to pull over 50% of their anticipated allocation of the whole Desk and allocate it to cronies of Steve Bodurtha.  To ensure that Bodurtha and Messina did not sabotage the largest IPO in history, Plaintiff was forced to notify further managers to prevent this from happening.

96. The business value of these "hot" IPO's and their significance cannot be understated.

97. From the SEC website in an article entitled, "Initial Public Offerings: Why Individuals Have Difficulty Getting Shares"

https://www.sec.gov/answers/ipodiff.htm: "The underwriters and the company that issues the shares control the IPO process.  They have wide latitude in allocating IPO shares.  The SEC does not regulate the business decision of how IPO shares are allocated … [w]hen an IPO is "hot," appealing to many investors, the demand for the securities far exceeds the supply of shares…  Since "hot" IPOs are in high demand, underwriters usually offer those shares to their ***most valued clients***."

98. Erin's exclusion from this privilege kept her from establishing and building any real relationships because she was prevented from giving any value to clients.

99. Furthermore, as detailed below, the real value Erin continued to give to clients was finally derailed by Defendant's employees, who put their own blind ambition

and disregard for SEC insider-trading laws above their clients, and finally

terminated Plaintiff for repeatedly standing up to them.

<u>INSIDER TRADING</u>

<u>DEFENDANT'S SYSTEMATIC AND ONGOING ATTEMPTS TO LEARN</u>

<u>INSIDE INFORMATION CONCERNING</u>

<u>OVER-THE-WALL  TRANSACTIONS IN VIOLATION OF SECURITIES LAWS</u>

100.     When Citi divested of Morgan Stanley (Smith Barney), the part of the

business, which had handled the due diligence for all legally sensitive

transactions, was also divested.

101.     To ensure that these transactions continued to be handled properly,

Plaintiff took it upon herself to learn everything that this former Citi department

would have handled.

102.     Erin became *the* authority on any trade that would be governed by Rule

144 (restricted stock).  Plaintiff was the one consulted on this legally sensitive

Rule 144 restricted and control stock.

103.     Plaintiff's knowledge was so much so that she was encouraged to head up

a developing group for handling legally sensitive stock.  Without taking credit,

Plaintiff did so, but by helping develop it instead.

104.     Plaintiff recognized that because Smith Barney/Morgan Stanley Group

had been using a system called SPEQTra (which was owned by Citi), Citi would

be losing the people that managed this.  Thus Citi would need to learn how to deal

with onboarding clients:  the rules; trading; how restricted stock trades were

handled on the retail side.  No one knew how to do this.

105.     To ensure the protection of material non-public information, Plaintiff made a point to ensure that these transactions were done correctly and in compliance with the law.

106.     Because Erin was already the trusted individual for handling these types of sensitive transactions, she became to go-to person for it.

107.     Plaintiff set up the due diligence for it and set up all the trades into SPEQTra.

108.     Plaintiff was vested with the authority and executed on all the 10b5-1 trading plans.

109.     Erin became the head of the retail side for this process and these transactions.

110.     Anyone from Personal Wealth Management, compliance, or anyone with any 10b5-1 or Rule 144 questions all came to Erin.

111.     Erin was the one responsible for entering the plans into the system and monitoring the volume limitations and the reports associated with them.

112.     If any person wanted to do anything that would be governed by Rule 144 on the retail side, this person would go to Plaintiff, (so long as it was American stock).  This would include any CEO, COO, any person on any Board of Directors, or any person holding stock subject to Rule 144.  (Rule 144 is a regulation enforced by the SEC that sets the conditions under which restricted, unregistered, and control securities can be sold or resold.)

113.     Ultimately, it was decided that this process should be handled away from the equity desk.  Erin maintained oversight to ensure quality control over this process all the way through 2014.

114.     Any client, and bankers of clients in possession of Rule 144 stock, stock with restrictions, or any legally sensitive stock would go through Plaintiff because she was the most versed on the subject, so would always be asked for advice on how to deal with sensitive situations and transactions.

115.     Anyone looking to sell or purchase any sensitive position would look to Plaintiff for advice.

116.     There was a specific procedure for protecting such information.  Because Plaintiff was the go-to person for restricted stock, she consistently had access to material non-public information and was extremely careful to ensure such information remained non-public, in accordance with a very formal process to protect such information from insider trading.

117.     James Messina, at all times during the actions alleged in this Compliant, was a manager and supervisor over Plaintiff.

118.     James Messina thought the position Plaintiff had was important and he felt insulted when any client came to Erin with questions instead of to him.

119.     James Messina constantly demanded that Erin disclose material non-public information of which he knew she was in possession.

120.     James Messina constantly harassed Plaintiff to tell him protected inside information so that he could pass the information along to his favored clients.

121.     Just weeks before Plaintiff was terminated, Erin finally approached Defendant's inside counsel and Defendant's Human Resources and blew the whistle and disclosed James Messina's conduct.

122.     On November 19, 2015, Erin met with Defendant's two attorneys discussing these illegal actions Defendant managers were doing.

123.     During this meeting, Plaintiff brought to the attention of Defendant's attorneys the actions of her boss, James Messina's illegal behaviors and the constant pressure he put her under to violate corporate policies set up to prevent violation of insider-trading regulations.

124.     During this meeting, Plaintiff received a note to call Bob Leonard, on a specific legally sensitive "over-the-wall" transaction about which Mr. Messina was demanding material non-public information.

125.     Plaintiff told Defendant's attorneys, "I need to call him about this over-the-wall transaction," the transaction she had approached them about to begin with, so they were already familiar.

126.     Defendant's attorneys assured her that Mr. Messina was disciplined for demanding material non-public information.

127.     Plaintiff called Bob Leonard and followed his instructions exactly regarding the transaction, and copied him on the emails.

128.     Bob Leonard was the Head of Special Equity Transaction Group ("SETG"), which dealt with acquiring or disposing anything to do with legally sensitive equity (Rule 144 stock).   Because Bob Leonard ran these types of trades

for the institutional side, Plaintiff worked closely with him and took instruction

from him all the time.

129.      Five days after Plaintiff blew the whistle on Defendant manager's illegal

behaviors, on Monday, November 24, 2015, Plaintiff was called to come to

Human Resources, Lilly Brown's office.  The same attorneys Plaintiff discussed

James Messina's illegal actions were in the office.

130.      After telling Human Resources and in-house counsel about her manager's

illegal behavior, Plaintiff was told to gather her belongings and not return until

they call her.

131.      On December 1, 2015, Steve Bodurtha, the Senior Manager and Gladys

Chen from Human Resources notified Plaintiff that she was terminated by

Defendant, not even two weeks after she disclosed Defendant manager's illegal

behaviors.

132.      Plaintiff was illegally terminated in retaliation for whistleblowing.

### CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims

against Defendant:

### COUNT ONE

(Discrimination based on gender under NYSHRL[5])

---

[5] "The same evidentiary framework is used to evaluate claims of discrimination based upon gender or age."
*Leibowtiz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).  "To establish a prima facie case of age
discrimination under the ADEA or gender discrimination under Title VII, a plaintiff must demonstrate the
following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject
to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an
inference of discrimination." *Id.*

133.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

134.     Defendant's discriminatory behavior and retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female.

135.     Plaintiff, as a female is in one of the protected classes listed under the ADEA and Title VII; Plaintiff was more than qualified for the position she had working for the Defendant; Plaintiff was unjustly terminated; and the facts show discriminatory animus and in circumstances biased against her.

136.     Defendant's consistent discrimination towards Plaintiff and women in general is revealed in its employees' treatment of her, in instances where she is deliberately excluded from business function during her employment, in disparate treatment of men versus females, in retaliatory termination for demanding equal treatment and lawful trading practices; and in ongoing libel and defamation on her U5.

COUNT TWO

(Harassment and Hostile Work Environment)

137.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

138.     Plaintiff suffered continuous and hostile conduct targeted at her as a result of her being female and in violation of Citi company policies

COUNT THREE

22

(Retaliation[6])

139.     Plaintiff repeats, realleges, and incorporates by reference each and every

allegation previously made herein as if the same were more fully set forth at

length herein.

140.     In retaliation for Erin's complaints of Citi's unlawful employment

practices, Citi took adverse employment actions against her.

141.     Among other things, Citi refused to return to Plaintiff her business

functionality, failed to provide promotional opportunities, and engaged in grossly

disparate treatment after she complained about Citi's gender discrimination.  Citi

ultimately terminated Plaintiff.

142.     By reason of Citi's conduct as alleged herein, Plaintiff is entitled to all

remedies available under New York Labor Law § 215.

COUNT FOUR

(Violation of Whistleblower Protection under Dodd-Frank)

143.     Plaintiff repeats, realleges, and incorporates by reference each and every

allegation previously made herein as if the same were more fully set forth at

length herein.

144.     Plaintiff engaged in protected activity as a whistleblower within the

meaning of Dodd-Frank because she engaged in conduct protected by Dodd-

Frank.

---

[6] "The burden-shifting framework laid out in *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817, governs retaliation claims under both Title VII and the NYSHRL. *Schiano*, 445 F.3d at 609.  To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* at 608.'" *Summa v. Hofstra University*, 708 F. 3d 115 (2d Cir. 2013).

145.     Plaintiff made these protected disclosures to Citi management and supervisors.[7]

146.     Plaintiff's disclosure of Citi's unlawful conduct related to her reasonable belief that Citi was engaging, participating, and condoning violations of securities laws.

147.     Plaintiff possessed a reasonable belief that violations of these laws, rules and regulations were occurring, and in fact did occur, when she discovered and disclosed those violations.  Defendant violated Dodd-Frank because it directly or indirectly discharged, demoted, suspended, threatened, harassed, or any other manner discriminated against Plaintiff the terms and conditions of her employment because of her whistleblower activities.

148.     As a result of Citi's conduct, Plaintiff has suffered substantial damages and is entitled to relief in the form of two times the amount of back pay otherwise owed, reinstatements, or front pay in lieu of reinstatement, plus attorneys' fees, interest and costs and any other statutory relief available to her.

## COUNT FIVE

### Federal Equal Pay Act

149.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

---

[7] Plaintiffs pursuing claims under Dodd Frank are not required to report to the SEC, but only to his/her superiors and/or employers. "Under SEC Rule 21F-2(b)(1), [Plaintiff] is entitled to pursue Dodd-Frank remedies for alleged retaliation after his report of wrongdoing to his employer, despite not having reported to the Commission before his termination." *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015).

150.    By the acts and practices described above, Defendant, Citi, in violation of the Federal Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"), has discriminated against Plaintiff by paying male employees higher wages than Plaintiff was paid for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

151.    Any disparity in the work as between the genders was made with deliberate discrimination by the Defendant in order to justify violating EPA laws.

152.    Defendant knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

153.    Plaintiff suffered lost wages as a result of Citi's willful and unlawful conduct.

COUNT SIX

(Violation of Whistleblower Protection under Sarbanes-Oxley, 15 U.S.C. §1514A)

154.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

155.    Citi is a company within the meaning of 18 U.S.C. § 1514A.

156.    Plaintiff, Erin Daly was an "employee" of Citi protected by Sarbanes-Oxley.

157.    Plaintiff engaged in activity that was protected by Sarbanes-Oxley, as more fully detailed herein, which included, but was not limited to, informing her

Citi supervisors, concerning conduct that she reasonably believed violated various provisions of federal law.

158.    Plaintiff reported her concerns to persons with supervisory authority over her, and to other such persons working for or on behalf of her employer.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.  A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under applicable Federal Law;

II.  A judgment granting equitable relief directing Defendant to cease and desist from exposing Plaintiff to discrimination and retaliation, including full expungement of her U-5;

III.  A judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings, including bonus payments, she would have received but for Defendant's discriminatory treatment and unlawful dismissal, including but not limited to, back pay, double back pay, contractual damages and pension benefits;

IV.  A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

V.  A judgment awarding Plaintiff double back pay damages for Defendant's intentional retaliation of Plaintiff;

VI.  A judgment awarding Plaintiff front pay;

VII.   A judgment awarding Plaintiff contract damages;

VIII.   A judgment awarding Plaintiff punitive damages;

  IX.   An award of prejudgment interest, costs, and attorneys' fees;

  X.   Such other and further relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury of all issues triable by jury in this action.


Dated:  Hopewell Junction, New York
           November 28, 2016


                                        Respectfully submitted,

                                        LAW OFFICE OF MICHELLE N. DALY

                       By:    /s/_____
                                        Michelle N. Daly, Esq.
                                        *Attorney for the Plaintiff*
                                        Heritage Executive Suites
                                        2537 Rt 52, Suite 1
                                        Hopewell Junction, New York 12533
                                        Tel.: (914) 475-7376
                                        Fax: (845) 447-1044